CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

MAR 11 2024

LAURA A. AUSTIN, CLERK
BY:  s/ H. MCDONALD
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| KATHLEEN P., | ) | |
| Plaintiff, | ) | Civil Action No. 4:22-cv-00125 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| MARTIN O'MALLEY, | ) | By:   Joel C. Hoppe |
| Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Kathleen P. asks this Court to review the Commissioner of Social Security's

("Commissioner") final decision denying her application for disability insurance benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. The case is before me

by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the

parties' briefs, and the applicable law, I cannot find that the Commissioner's final decision is

supported by substantial evidence. Accordingly, I respectfully recommend that the presiding

District Judge reverse the decision and remand the matter under the fourth sentence of 42 U.S.C.

§ 405(g).

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see

also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether

substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th

Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th

Cir. 2017); 20 C.F.R. § 404.1520(a)(4)[1] The claimant bears the burden of proof through step

four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the

claimant is not disabled. *See id.*

II. Procedural History

In February 2020, Kathleen filed for DIB alleging she had been disabled since February

27, 2019, because of a brain tumor, trouble swallowing, shortness of breath, depression, and

anxiety, among other impairments. *See* Administrative Record ("R.") 219, 246. She was 56 years

old in February 2019, R. 123, making her a person "of advanced age" under the regulations, 20

C.F.R. § 404.1563(e). Virginia Disability Determination Services ("DDS") denied her claim

initially in June 2020, R. 123–35, and upon reconsideration in March 2021, R. 136–59. On

October 7, 2021, Kathleen appeared with counsel and testified by telephone at an administrative

hearing before ALJ Linda Harris Crovella. R. 43–74. A vocational expert ("VE") also testified at

the hearing. R. 73–83.

ALJ Crovella issued an unfavorable decision on November 3, 2021. R. 25–35. At step

one, she found that Kathleen had not engaged in substantial gainful activity since February 27,

2019. R. 27. At step two, she found that Kathleen had one "severe" medically determinable

impairment ("MDI"), which she characterized as "left foramen magnum meningioma status-post

left lateral craniotomy and partial resection with residual tumor." *Id.* All of Kathleen's other

MDIs were non-severe, R. 27–29, including her diagnosed "adjustment disorder, depression, and

anxiety," R. 28. The ALJ found that this single mental "impairment" caused "mild limitations" in

Kathleen's overall abilities to (1) understand, remember, or apply information, (2) interact with

---

[1] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the
date of the Commissioner's final written decision.

others, (3) concentrate, persist, or maintain pace, and (4) adapt or manage herself. R. 28–29; *see generally* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(E)(1)–(4). At step three, the ALJ concluded that Kathleen's severe MDI did not meet or medically equal the Listing for presumptively disabling benign brain tumors. R. 29 (citing 20 C.F.R. pt. 404, subpt. P., app. 1 § 11.05).

Next, ALJ Crovella determined that Kathleen had the residual functional capacity ("RFC") to do "medium work"[2] involving at most "frequent" kneeling, crouching, or crawling, and only "occasional" climbing ladders/ropes/scaffolds and "speaking on the telephone." R. 29. Based on the VE's testimony, the ALJ found that this RFC allowed Kathleen to return to her past relevant work as an assistant manager at a gas station, as that job is generally performed in the national economy. *See* R. 33 (citing R. 74–77). The ALJ also found that a hypothetical worker with this RFC and Kathleen's vocational profile could perform certain unskilled "medium" work occupations (sandwich maker, laundry laborer, and stores laborer) that offered a significant number of jobs in the national economy. R. 33–34 (citing R. 77–78). Accordingly, the ALJ found that Kathleen was not disabled during the relevant period. R. 34. The Appeals Council denied Kathleen's request to review the ALJ's decision, R. 11–13, and this appeal followed.

## III. Discussion

Kathleen challenges the Commissioner's denial of benefits on two grounds. *See* Pl.'s Br. 11–22, ECF. No. 21. First, she argues that ALJ Crovella's RFC finding is not supported by substantial evidence because the ALJ did not consider Kathleen's non-severe mental MDI after step two, and she failed to explain why that MDI caused only "mild" limitations in her overall abilities to understand, remember, or apply information, interact with others, and concentrate,

---

[2] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c). A person who can meet these strength demands can perform the "full range of medium work" if she can also stand or walk, "off and on, for a total of approximately 6 hours in an 8-hour workday." SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983).

persist, and maintain pace in the workplace. *See id.* at 11–14. Second, she argues that the ALJ's

RFC analysis is not supported by substantial evidence because the ALJ improperly evaluated the

medical opinions of Scott Greene, M.D., and Victor Adaniel, M.D. *Id.* at 14–22. Both physicians

opined that Kathleen's brain tumor and other physical MDIs caused work-preclusive exertional

limitations, that her depression and anxiety affected her physical condition, and that she would

be off-task for at least 5% of a normal workday. *See* R. 354–57 (Dr. Adaniel, July 2021); R.

932–35 (Dr. Greene, Aug. 2020); R. 1142–45 (Dr. Adaniel, Sept. 2021). Kathleen's arguments

are persuasive.

*A.    The Legal Framework*

A claimant's RFC is his or her "maximum remaining ability to do sustained work

activities in an ordinary work setting" for eight hours a day, five days a week despite his or her

medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996)

(emphasis omitted). The ALJ makes the RFC finding between steps three and four of the five-

step disability determination. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659

(4th Cir. 2017) (citing 20 C.F.R. § 404.1520(e)). "This RFC assessment is a holistic and fact-

specific evaluation; the ALJ cannot conduct it properly without reaching detailed conclusions at

step 2 concerning the type and [functional] severity of the claimant's impairments." *Id.*

The Commissioner "has specified the manner in which an ALJ should assess a claimant's

RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by

definition "a function-by-function assessment based upon all of the relevant evidence of [the

claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ

must identify each impairment-related functional restriction that is supported by the record, *see*

*Monroe v. Colvin*, 826 F.3d 17, 179 (4th Cir. 2016). The RFC should reflect credibly established

"restrictions caused by medical impairments and their related symptoms," including those that the ALJ found "non-severe," that impact the claimant's "capacity to do work-related physical and mental activities" on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1, *2.

Second, the ALJ's decision must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explaining how he or she weighed any inconsistent or contradictory evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will affirm the ALJ's RFC findings when he or she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and the written decision built an "accurate and logical bridge from that evidence to his [or her] conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018), *superseded on other grounds as recognized in Rogers v. Kijakazi*, 62 F.4th 872 (4th Cir. 2023). *See Shinaberry v. Saul*, 952 F.3d 113, 123 (4th Cir. 2020); *Thomas*, 916 F.3d at 311–12; *Patterson*, 846 F.3d at 662.

B.    *Summary*

  1.    *Treatment Records*

On February 27, 2019, Kathleen had a cervical spine MRI. R. 378. As most relevant here, it showed "a 2.0-cm mass anterior to the brainstem slightly to the left of the midline below the level of the pons causing significant impingement of the brainstem" and "low-lying cerebellar tonsils." *Id.* A brain MRI showed a "uniformly enhancing mass along the left side of the pons" with a "dural tail." R. 401. Findings were otherwise normal. *Id.* The radiologist, Douglas Eiland, M.D., concluded that the lesion had "the MRI characteristics of a meningioma." *Id.*

Kathleen saw Scott Murphy, Ph.D., P.A.-C., a primary care provider, from March 2019 to July 2020. R. 433–41, 888–90, 970–78, 982–84. At different times, she reported myalgia, arthralgia, joint swelling, joint pain, R. 439, 970, 973, 982, headaches, R. 977, anxiety, depression, R. 433, and left knee pain, R. 970. She was able to eat, bathe, dress, use the toilet, and do transfers. R. 433, 436, 439, 888, 970, 973, 976, 982. On some examinations, she had results within normal limits, R. 434, 889, while on others, she had severe cervical spine pain, R. 983, left arm weakness, R. 440, 974, left leg weakness, R. 440, 974, left knee pain, R. 440, 971, and decreased range of motion in the left knee, R. 440. She used a walker on exam in June 2019. R. 974. That August, an MRI of her left knee showed "[m]oderate knee joint effusion," "moderate narrowing of the medial compartment," "partial extrusion of the medial meniscus," "extensive bone marrow edema along the medial femoral condyle," "a complete tear of the medial collateral ligament," and "extensive bone marrow edema in the lateral femoral condyle." R. 400. The medial collateral ligament appeared "to be avulsed from its insertion on the femoral condyle." *Id.* Findings were otherwise normal. *Id.* The radiologist concluded that there was "extensive bone marrow edema in both the medial and lateral femoral condyles consistent with microtrabecular fracture," Kathleen's medial collateral ligament was torn, and she had "[m]oderate knee joint effusion." *Id.*

During the relevant period, Dr. Murphy assessed Kathleen with a brain tumor, restless leg syndrome, migraines, insomnia, sleep apnea, cervical scoliosis, R. 435, 438, 441, 890, 972, 975, 978, 984, anxiety, R. 435, 438, 441, 890, 972, 975, 978, left arm hemiplegia, R. 441, 972, 975, depression, R. 435, 438, 441, 890, 972, left knee pain, R. 972, vocal cord paralysis, and collateral tear in the left knee, R. 435, 890. He noted that the left arm hemiplegia and collateral tear of the

left knee were "[b]etter" in February 2020. R. 438. He prescribed Zoloft, R. 435, 890, Xanax, R.

890, 978, Flexeril, ropinirole, R. 890, and a C-PAP machine, R. 975.

On April 29, 2019, Kathleen saw Siviero Agazzi, M.D., a neurosurgeon, for a

neurosurgical consultation regarding her "[f]oramen magnum tumor." R. 685. Kathleen reported

that "for 3–6 months," she "awaken[ed] with headaches" and had "tingling over face and below

the knees" and "sudden, sharp occipital pain that radiate[d] anteriorly with [V]alsalva." *Id.* She

denied "dropping objects, gait instability/falls, focal weakness, [and] spasticity." *Id.* On

examination, she had 5/5 strength throughout and normal gait, muscle bulk and tone, and

sensation to light touch. R. 687. Her plantar reflexes were normal, but her brachioradialis, biceps,

triceps, and patellar reflexes were 2+ on the right and 3+ on the left. *Id.* Hoffman's sign was

present on only the left side. *Id.* Dr. Agazzi explained that the tumor was "the most likely cause

of" her "increased reflexes on the left side, morning headaches, and the sudden sharp pain she

gets with straining." *Id.* He noted that "the tumor [wa]s clearly compressing her brainstem and

causing signs and symptoms of brainstem compression and lower cranial nerve compromise." *Id.*

He recommended surgical intervention with the goal of a "maximum safe resection." *Id.* He

noted that there was "a good chance that pieces of tumor adherent to critical neuro-vascular

structures and the brainstem w[ould] be le[f]t behind," but those "residual pieces c[ould] be

radiated or followed for growth." *Id.* He explained the procedure, its risks, and its benefits. R.

687–88. Kathleen decided to go forward with brain surgery. R. 684.

Kathleen had a pre-operative appointment on May 9. R. 681–83. On examination, her

muscle tone was "[f]irm, without spasticity, atrophy[,] or abnormal movements in upper and

lower extremities." R. 682. She had intact recent and remote memory and "smooth and clear"

speech. *Id.* She was able to concentrate and was "[n]ot easily distracted." *Id.* Her gait was

normal. *Id.* On May 13, Kathleen had an MRI and CT scan of her brain. R. 883–85. The MRI

showed "what [wa]s probably a meningioma, partially encasing the left vertebral artery." R. 883.

It showed no aneurysm, "hemodynamically significant stenosis," or "significant narrowing of the

lumen." R. 883–84. The CT scan showed a mass "in the posterior fossa with mass effect on the

brainstem and cerebellum." R. 884. There may have been "ectopia of the cerebellar tonsils[,] but

it [wa]s difficult to confirm on CT." *Id.* The CT scan also showed "mass effect on the fourth

ventricle but no obstructive hydrocephalus." *Id.*

On May 28, 2019, Kathleen underwent a left far lateral craniotomy to remove the tumor

from her brain. R. 567–77. The tumor resection was "[s]ubtotal." R. 575. A post-operative brain

MRI showed a "residual enhancing tumor along the left anterolateral." R. 603. The residual

tumor caused "mass effect on the adjacent cervical medullary junction[,] which [wa]s displaced

to the right." *Id.* There was "also crowding at the foramen magnum," abutting "the distal left

vertebral artery[,] which appear[ed] patent." *Id.* In that region, "[t]here [we]re some

postoperative blood products" and "a small amount of pneumocephalus." *Id.* There were

"scattered foci of T2 hyperintensity throughout the white matter[,] which [we]re nonspecific, but

likely related to changes of chronic microvascular ischemia." *Id.* Findings were otherwise

normal. *Id.* The impression was that "[t]here [wa]s some persistent mass effect and crowding at

the foramen magnum." *Id.*

Kathleen was in the hospital until June 4, at which point she was discharged to an in-

patient rehabilitation facility. R. 577–677. On examination at discharge, she had no acute

distress, clubbing, cyanosis, or edema, and her neck was supple. R. 672. She was cooperative,

pleasant, and motivated and had normal attention and intact short- and long-term memory. R.

676. She answered questions and was "able to follow multi-step instructions." *Id.* She had good

balance with static and dynamic sitting, "good- balance" with static standing, and "fair+ balance"

with dynamic standing. *Id.* She still needed assistance to dress and groom herself. *Id.* She was

encouraged to walk "as tolerated," but instructed not to lift anything weighing more than ten

pounds. R. 673.

Kathleen received intensive in-patient rehabilitation from June 4 to June 11, at which

point she was "discharged home with caregivers." R. 456–563. Prior to discharge, she reported

neck pain and focal weakness, but she reported no memory loss, nervousness, or anxiety. R. 554.

On her last physical examination before discharge, she was pleasant, calm, and cooperative and

had hypophonic, clear, fluent, and appropriate speech. *Id.* During her psychotherapy session

before discharge, she reported feeling nervous about discharge. R. 562. On examination, she

"[m]aintained appropriate eye contact" and was "alert, attentive, and responsive." *Id.* Her affect

was "anxious and sad," but her speech was "clear, fluent, and effective." *Id.* She had a PHQ-9

score of 10, "indicating mild depressive symptoms," and a GAD-7 score of 3, "indicating normal

anxiety." *Id.* Her discharge diagnoses were benign meningioma and "[a]djustment disorder with

mixed anxiety and depressed mood." R. 556–57.

Providers also evaluated Kathleen's functional status at discharge. R. 559. She still used a

wheelchair, meaning she needed maximal assistance in locomotion. *Id.* She needed "minimal

assistance" with grooming; bathing; using the toilet; and transferring to a bed, chair, wheelchair,

or toilet. *Id.* She had "modified independence" with problem solving, memory, and transferring

to a tub or shower, meaning that she still required "supervision" for those functions. *Id.* She had

"complete independence" with comprehension, expression, and social interaction. *Id.* She also

still required a feeding tube because she could not swallow normally. *See* R. 559–60, 562. She

was not allowed to drive until cleared by a physician. R. 560. Kathleen's family members were encouraged to provide "intermittent supervision" as she continued to recover at home.

On July 25, Kathleen had a postoperative visit with Dr. Agazzi. R. 455. She noted that she continued to improve, she no longer needed a walker, and her headaches had "completely resolved." *Id.* She was starting to eat again, but her feeding tube was still in place. R. 455. On exam, she had focal weakness "in the left shoulder-upper arm . . . when abducting the arm." *Id.* She had a weak left shoulder shrug. R. 456. Dr. Agazzi opined that Kathleen was making "steady improvement" six weeks after brain surgery. *Id.* He instructed her to continue speech therapy, as well as occupational therapy "for her weak" shoulder function. *Id.* Kathleen's feeding tube fell out in late September 2019. *See* R. 424–25, 452. She did not get it replaced. R. 452.

Kathleen saw Dr. Greene, an otolaryngologist, for hoarseness and difficulty swallowing from August 2019 to July 2020. R. 413–16, 427–30, 905–18. At first, she denied shortness of breath, R. 414, 427, 916, but at later visits, she reported "difficulty breathing," R. 906, 910. On examination, her breathing was unlabored, she had normal breath sounds, and there was "no accessory muscle use or intercostal retractions." R. 415, 429, 907, 912, 917. She had normal mood and appropriate affect. R. 415, 429, 908, 912, 917. Dr. Greene assessed her with dysphagia, laryngeal edema, and vocal cord paralysis. R. 415, 430, 908, 912, 917. He treated these issues with prednisone, R. 416, and laryngoplasties, R. 418, 424. She had "[i]nterval improvement with steroid." R. 908, 913. After the laryngoplasties, Kathleen initially improved, but then, her symptoms worsened, and on endoscopies, there was "[b]owing." R. 416, 908, 912–13, 918. Dr. Greene noted that she "[l]ikely" had an "under medialized" left vocal fold. *Id.*

On August 29, 2019, Kathleen had a voice evaluation and laryngeal videostroboscopy with Dr. Greene. R. 425. She reported that her symptoms began after the brain-tumor excision.

*Id.* Although she reported "some improvement in vocal quality," other symptoms, including shortness of breath, persisted. *Id.* Dr. Greene noted that the "[s]tructures and function of the oral mechanism appear[ed] to be adequate for speech and voice production." *Id.* On examination, Kathleen had incomplete glottic closure of the posterior gap, "[p]ooling of secretions in left pyriform sinus," left vocal cord paralysis in the paramedian position, and "[h]oarse, breathy" phonation. R. 426. Her breath support needed improvement, but she had normal resonance. *Id.* Dr. Greene's impression was that Kathleen had moderate dysphonia "characterized by breathy vocal quality, higher pitch, and shortness of breath." *Id.* He recommended that she "[i]ncrease daily fluid intake of non-caffeinated beverages." *Id.* He noted that "medialization of the left true vocal cord may be recommended to assist vocal cord closure for airway protection and voice production." *Id.* He opined that Kathleen had a good potential for functional improvement with "adherence to treatment plan." *Id.*

On September 26, Kathleen saw William Cottrell, M.D., for left knee pain that had "started gradually" in July "with no history of knee injury." R. 403. She had the associated symptom of "giving way." *Id.* She reported that the pain woke her from sleep; "walking, stairs, squatting, and kneeling" worsened the pain; and "rest and heat" improved the pain. *Id.* She also reported that "the problem [wa]s getting better." *Id.* She reported shortness of breath. *Id.* On examination, she had appropriate mood and affect. R. 404. She had full range of motion "in all areas tested," 5/5 strength "in all muscle groups tested," intact sensation, and normal gait. *Id.* Her left knee was tender, but it had no effusion, crepitus, swelling, ecchymosis, or deformity. *Id.* An X-ray of the left knee was normal; it showed "no evidence of fracture, bone lesions, deformity," arthritic change, or significant soft tissue abnormalities. R. 404–05. Dr. Cottrell ordered "a course of physical therapy," gave Kathleen "knee conditioning exercises," and advised that she

take Tylenol and apply ice as needed. *Id.* He expected her to "benefit from rehab efforts and activity modification for now." *Id.*

Kathleen saw Dr. Agazzi on November 21, 2019, for a six-month follow-up visit. *See* R. 451–54. Dr. Agazzi noted that her "left shoulder strength [wa]s normal" again and the "facial numbness and left hand numbness and loss of dexterity" that she experienced before surgery had resolved. R. 452. Kathleen reported continuing "[m]ild left neck pain," but "no headaches." *Id.* On examination, she had normal gait and coordination; full range of motion; and normal mood, memory, affect, and judgment. R. 453. A brain MRI showed that the residual left foramen magnum tumor was "slightly larger." *Id.* Dr. Agazzi "d[id] not believe" that this slight enlargement was "a significant change." R. 454. He planned to "keep a close eye on it with a follow-up MRI in 6 months." *Id.* At that point, if "grow[th] [wa]s confirmed," Kathleen would need radiation. *Id.* Otherwise, Kathleen had "recovered very well" in the past six months. *Id.*

On July 30, 2020, Kathleen saw Dr. Agazzi for her one-year follow-up appointment. R. 850–55. She reported "[t]ingling in her fingers," hand clumsiness, "[d]ifficulty gripping items," and shortness of breath related to vocal cord palsy. R. 851. On examination, she had fluent and breathy speech. R. 854. She had a "[s]light decrease in grip strength," positive Hoffman's sign, and "+3" patellar reflexes bilaterally. *Id.* A new MRI showed "[v]ery slight growth/essentially stable residual" tumor. *Id.* It also showed "contact [with] and compression of the upper cord," which could have been "causing the long-track signs." *Id.* Dr. Agazzi noted that Kathleen had clinical signs of myelopathy, including decreased hand strength bilaterally, and Hoffman's sign. R. 855. He also noted that there was "MRI evidence of persistent medulla compression, slightly more than prior." *Id.* He recommended that Kathleen undergo a second brain surgery to "de-bulk" the tumor, followed by a course of treatment with "cyberknife or fractionated radiation

13

depending on the extent of the debulking." *Id.*; *see* R. 306 ("On 7/30/2020 I found out the

meningioma tumor is pressing on my spinal cord causing numbness and tingling in my hands &

feet. My neurosurgeon suggests another brain surgery to trim the tumor. . . . By doing this I can

be treated with a 1 time radiation or 6 weeks of radiation to treat [the remaining] tumor."). The

second surgery would be risky, and likely require Kathleen to use a feeding tube and undergo

extensive rehabilitation like she did after the first surgery. R. 855. It may also "worsen[] her

swallowing, causing paralys[is] that could be permanent." *Id.* Dr. Agazzi advised against treating

the tumor with radiation alone, however, because it would "cause temporary enlargement of the

tumor" and "worsening compression of the spinal cord." R. 854. Kathleen could not schedule the

second brain surgery because she did not have health insurance. R. 306, 855.

Kathleen saw Dr. Adaniel, a primary care physician, about once a month from September

2020 through at least September 2021. R. 1142; *see generally* R. 1023–35, 1037–40, 1043–45,

1047–54, 1088–91, 1093–1106, 1110–1112, 1114–1116, 1134–1114. At various times, she

reported numbness and tingling in her hands and feet, R. 1023, 1037, 1047, 1051, 1088, 1093,

1103, 1110, pain and swelling in her extremities, R. 1043, 1051, 1088, 1093, 1097, back pain, R.

1088, 1097, and tension in the back of her neck, R. 1097. She also reported difficulty breathing

and shortness of breath with exertion, R. 1023, 1027, 1051, 1093, 1097, headaches, R. 1023,

1027, 1110, lightheadedness, R. 1037, 1110, fatigue, R. 1037, 1093, dizziness, R. 1027,

depression, and anxiety. R. 1027, 1051, 1093. She complained that her third and fourth fingers

curved and locked up, R. 1051, 1088, causing difficulty gripping and holding onto objects, R.

1088. On examinations, she had normal gait and was alert, oriented, cooperative, and not "in

acute distress." R. 1024, 1029, 1034, 1039, 1044, 1049, 1053, 1090, 1095, 1099, 1105, 1112. She

had "quiet, even[,] and easy respiratory effort with no use of accessory muscles"; "normal

resonance"; no flatness, dullness, or tenderness; and "normal tactile fremitus." R. 1024, 1029,

1035, 1039, 1045, 1049, 1053, 1090, 1095, 1099, 1105, 1112. She had normal sensation and

coordination. R. 1025, 1029, 1035, 1039, 1045, 1049, 1053, 1090, 1095, 1099, 1105, 1112. At

various points, she also had "+ 2/3 finger catching with extension," R. 1090, and a limp, R. 1043.

She completed two PHQ-9s with scores of six, R. 1054, and nine, R. 1099, which Dr. Adaniel

characterized as "negative depression screening[s]," R. 1054, 1099. He assessed Kathleen with

diabetes and other physical impairments, as well as anxiety and depression. R. 1025, 1030, 1040,

1050, 1054, 1096, 1100, 1106, 1113. Dr. Adaniel prescribed alprazolam (Xanax), R. 1025, 1030,

1040, 1050, 1096, sertraline (Zoloft), R. 1025, 1030, 1040, 1050, 1054, 1096, 1106, 1113, and

venlafaxine (Effexor), R. 1106, 1113, 1137, to help manage Kathleen's anxiety and depressive

symptoms. She took these medications as prescribed. *See, e.g.*, R. 1030, 1040, 1135.

On June 9, 2021, Kathleen saw an otolaryngologist, Jay Cline, M.D., for hoarseness

related to her left vocal cord paralysis. R. 1077–78. She reported that she had "problems

breathing upon exertion" and that "she had her vocal cord injected twice," but "it did not help."

R. 1077. On examination, she was alert, oriented, cooperative, and "[n]ot in acute distress." R.

1078. She had "quiet, even[,] and easy respiratory effort with no use of accessory muscles." *Id.*

"FDL evaluation" showed that her left vocal cord was "paralyzed, but she ha[d] good glottic

closure." *Id.* Dr. Cline explained that Kathleen's "dysphagia and associated shortness of breath

[were] related to her left [vocal cord] being paralyzed in a medial position." *Id.* He "discussed

treatment options with her, including a referral at UVA or VCU." *Id.*

Kathleen had a brain MRI on July 19, 2021. R. 1127. It showed a "homogenously

enhancing dural-based left parasagittal premedullary cistern mass . . ., unchanged in size" since

last year's study. *Id.* The impression was that Kathleen had a "[s]table premedullary cistern

meningioma narrowing the foramen magnum[,] impinging and deforming the medulla," and "[s]cattered punctate FLAIR and T2 changes consistent with chronic microvascular disease." R. 1127–28.

The same day, Kathleen saw Bridget Quinn, M.D., Ph.D., a radiation oncology resident, and Timothy Harris, M.D., Ph.D., an oncologist, to establish care and get an opinion on managing her residual tumor. R. 1120–22. She denied "other neurologic changes" after her surgery. R. 1120. She reported that she was "feeling well" and denied "significant headaches, new neurologic deficits, vision changes, dizziness, [and] pain." *Id.* On examination, she was "in no acute distress." R. 1121. She was "breathing comfortably on room air" with "no increased work of breathing." *Id.* She had a "soft, higher pitched voice," but she had "no other gross deficits." *Id.* The doctors explained Kathleen's options and their associated risks and benefits. They advised against a second brain surgery, "especially given that total resection was not possible during her first surgery." R. 1122. They discussed "definitive radiation as an alternate option versus continued observation," but noted that radiation could be risky "given the [tumor's] location near her brainstem." *Id.* Kathleen "elected to proceed with radiotherapy" in large part because she "did not want to risk development of irreversible neurologic symptoms with progression." *Id.*

On August 16, Kathleen saw Dr. Adaniel for swelling and "stinging pains" in her left arm. R. 1114. The arm had been swollen for three days. *Id.* She complained of a "knot to left elbow" and pain in that area. *Id.* She had no "known falls or injuries." *Id.* She reported that applying ice to the swollen area "helped make it 'freer to move.'" *Id.* She reported that she had experienced "chest tightness" intermittently for one to two weeks, but she had no chest tightness that day. *Id.* She also reported that she "always" had shortness of breath, but that symptom "was

16

no worse than usual." *Id.* She complained of a headache in the "frontal area" that was "'like a band' going around [her] head from the left side." *Id.* She also complained of dull pain in her "right upper leg," starting at her hip and going "all the way down," but she did not report "redness or swelling to [the] same area." *Id.* On examination, her left lower arm was "warm to touch" and appeared red "from 3.5 in above left elbow down to left wrist area." *Id.* Examination findings were otherwise unchanged. R. 1116. Dr. Adaniel assessed her with cellulitis and edema in her arm and prescribed a Zithromax Z-Pak. *Id.*

On September 7, Kathleen followed up with Dr. Adaniel after being hospitalized from August 22 to 26 for cellulitis, an abscess in her left elbow, and sepsis. R. 1134. She reported that a doctor "opened up" a "3 cm deep x 6 cm wide" area and debrided it. *Id.* She reported that her anxiety and depression were "about the same" and denied recent thoughts of or attempts to harm herself or others. *Id.* She had no recent chest pains, shortness of breath, or dizziness. *Id.* She reported swelling in her feet and numbness and tingling in her hands and feet. *Id.* She also reported having daily headaches "for the past 2 weeks in [her] entire head." *Id.* She completed a PHQ-9 with a score of six, which Dr. Adaniel characterized as a "negative depression screening." R. 1137. Examination findings were otherwise unchanged. R. 1136. Dr. Adaniel prescribed an antibiotic, and continued Effexor and Xanax. R. 1137.

 2. *Medical Opinions*

Jeaudine Hill, M.D., and J. Patrick Peterson, Ph.D., J.D., reviewed Kathleen's records for DDS's initial review in the spring of 2020. *See* R. 124–34. They opined that Kathleen's benign brain tumor was a "severe" MDI and that all of her other medical conditions, including an anxiety disorder and a depressive disorder, were non-severe MDIs. R. 128. More specifically, Dr. Peterson opined that Kathleen's mental MDIs caused no limitations in her overall capacities

to understand, remember, or apply information and to adapt or manage herself, and "mild"

limitations in her overall capacities to interact with others and to maintain concentration,

persistence, or pace. R. 129. He explained that although Kathleen complained of "some

secondary/ancillary anxiety/worry/self-concern [and] mood fluctuations related to

medical/somatic issues," she had not pursued any psychiatric treatment to address those

symptoms besides her primary care physician providing "some mild meds." R. 129. He also

concluded that the record evidence was "contraindicative of [the] presence of any diagnosable

mental d[isorder] beyond possible mild [a]djustment d[isorder]." *Id.*

As for Kathleen's physical abilities, Dr. Hill opined that she could occasionally "lift

and/or carry" fifty pounds and could frequently "lift and/or carry" twenty-five pounds. R. 130.

She could push and/or pull within those same strength parameters. *Id.* She could sit and "[s]tand

and/or walk" for "[a]bout 6 hours in an 8-hour workday." *Id.* Dr. Hill based these exertional

limitations on evidence of Kathleen's "benign meningioma resected in 2019 with no residual

effects" and a history of a torn meniscus in her left knee. *Id.* The fact that she had "no physical

deficits" on physical examination supported a conclusion that she was "capable of medium

work." R. 131. Because of her history of a torn meniscus, Kathleen was unlimited in her abilities

to climb ramps or stairs, balance, and stoop; could occasionally climb ladders, ropes, or

scaffolds; and could frequently kneel, crouch, and crawl. R. 131. She had no manipulative,

visual, communicative, or environmental limitations. *Id.*

In August 2020, Dr. Greene completed a physical impairment questionnaire. R. 932–35.

He identified Kathleen's diagnoses as "vocal cord paralysis, brain tumor," and neuropathy and

her symptoms as "shortness of breath and labored breathing due to paralyzed vocal cord,

fatigue," and hoarseness. R. 932. He also identified depression and anxiety as "psychological

18

conditions affecting [Kathleen]'s physical condition." R. 933. He opined that Kathleen could not

walk one city block before needing to rest or experiencing severe pain. *Id.* She could sit or stand

each for ten minutes at a time and sit and stand/walk for fewer than two hours total in an eight-

hour workday. *Id.* She would need to take unscheduled fifteen-minute-long breaks after working

for ten minutes because of her chronic fatigue and "difficulty breathing." *Id.* She needed to

elevate her legs with "prolonged sitting" for thirty minutes. R. 934. Because of her imbalance

and weakness, she needed to "use a cane or other hand-held assistive device" when standing or

walking. *Id.* She could rarely lift or carry ten pounds or less and never lift or carry twenty pounds

or more. *Id.* She could rarely twist and "[s]toop (bend)" and never crouch, squat, or climb ladders

or stairs. *Id.* She had "significant limitations with reaching, handling," and fine manipulation. *Id.*

She could grasp, turn, or twist objects; do fine manipulation; and reach for one to five percent of

an eight-hour workday. *Id.* She would likely be off task for five percent of an eight-hour

workday, even if that work involved only "simple" tasks. R. 935. Because of her "difficulty

breathing [and] hand numbness," she was "[i]ncapable of even 'low stress' work." *Id.* She would

likely miss work because of her impairments "[m]ore than four days per month." *Id.*

    Robert McGuffin, M.D., and Louis Perrott, Ph.D., reviewed Kathleen's updated record

for DDS's reconsideration review in March 2021. *See* R. 138–54. Dr. McGuffin adopted Dr.

Hill's initial physical RFC, but he determined that Kathleen could occasionally climb ramps or

stairs, could frequently balance and stoop, and needed to avoid concentrated exposure to hazards.

R. 152–54. He reasoned that Kathleen was "restricted due to history of left foramen magnum

tumor in 2019 with no residual effects, diabetes, hypertension, hypercholesterolemia, history of

migraines, and restless leg syndrome." R. 153–54. He explained that he agreed with the initial-

level assessment that Kathleen had "a medium RFC" and found that it was "consistent [with] and supported by objective medical evidence." R. 154.

Dr. Perrott affirmed Dr. Peterson's initial assessment that Kathleen had "non-severe" anxiety disorder and depressive disorder. R. 149. He explained that he agreed with the initial-level assessment and found it "consistent [with] and supported by objective medical evidence." R. 150. Unlike Dr. Peterson, however, Dr. Perrott found that Kathleen's mental impairments caused "mild" limitations in all four broad areas of mental functioning, including the abilities to understand, remember and apply information. He did not explain why his opinion differed from Dr. Peterson's opinion in this respect.

In July 2021, Dr. Adaniel completed a diabetes impairment questionnaire. R. 354–57. He identified Kathleen's symptoms as fatigue, infections or fevers, swelling, abdominal pain, and nausea or vomiting. R. 354. He identified anxiety and depression as "psychological conditions affecting [Kathleen]'s condition." *Id.* He opined that she could walk four city blocks before needing to rest or experiencing severe pain. R. 355. She could sit for twenty minutes at a time, stand for five minutes at a time, sit for less than two hours of an eight-hour workday, and stand or walk for less than two hours of an eight-hour workday. *Id.* She needed a job that permitted shifting positions at will. *Id.* In an eight-hour workday, she would need to walk around for ten minutes every ten minutes. *Id.* She would need ten-minute-long unscheduled breaks every hour. *Id.* She did not need to elevate her legs with prolonged sitting. *Id.* When standing or walking, she would not need to "use a cane or other assistive device." R. 356. She could rarely lift and carry ten pounds or less and never lift and carry twenty pounds or more. *Id.* She could rarely twist, "[s]toop (bend)," crouch, squat, and climb ladders and stairs. *Id.* She could do fine manipulation and grasp, twist, or turn objects for ten percent of an eight-hour workday. *Id.* She could reach for

twenty percent of an eight-hour workday. *Id.* She needed to avoid exposure to extreme cold and

high humidity, but she had no other environmental restrictions. *Id.* She would likely be off task

for ten percent of a workday, even if that work involved only "simple" tasks. R. 357. She was

"[i]ncapable of even 'low stress' work." *Id.*

In September 2021, Dr. Adaniel completed a physical impairment questionnaire. R.

1142–45. He opined that "emotional factors contribute[d] to the severity of [Kathleen]'s

symptoms and functional limitations." R. 1142. He identified depression and anxiety as

"psychological conditions affecting [Kathleen]'s physical condition." R. 1143. He opined that

she could walk two city blocks before needing to rest or experiencing severe pain. *Id.* She could

sit for twenty minutes at a time, stand for ten minutes at a time, sit for one hour total, and stand

or walk for at least six hours in an eight-hour workday. *Id.* She needed a job that permitted

"shifting positions at will." *Id.* She needed to walk for five minutes every thirty minutes. *Id.* She

would not need to take unscheduled breaks during a workday and would need one break daily

because of "[p]ain/paresthesias, numbness." *Id.* She did not need to elevate her legs with

"prolonged sitting" or "use a cane or other hand-held assistive device" when standing or

walking. R. 1144. She could never lift any amount of weight, twist, "[s]toop (bend)," crouch,

squat, or climb stairs or ladders. *Id.* She did not have "significant limitations with reaching,

handling, or" fine manipulation. *Id.* She could grasp, turn, or twist objects for five percent of an

eight-hour workday. *Id.* She would be off task for five percent of an eight-hour workday, even if

that work involved only simple tasks. R. 1145. She was "[c]apable of moderate stress [or] normal

work." *Id.*

    *3.*    *Kathleen's Statements*

Kathleen completed a Supplemental Pain Questionnaire, a Supplemental Anxiety Questionnaire, and two Adult Function Reports as part of this DIB claim. R. 260–73, 316–24. She has daily back pain. R. 260–61; *see also* R. 263. Because of her brain tumor, her left vocal cord is paralyzed, R. 263, 316, making it hard for her "to talk, breath[e], [or] do any activity for more than" ten minutes, R. 263. She has numbness and tingling in her hands and feet and "almost constant headaches that are debilitating." R. 316; *see also* R. 322. Her "hand strength has diminished," and she has difficulty grasping items. R. 268; *see also* R. 322. She started having anxiety attacks in "[l]ate November 2018," R. 271, and has them "1–3 times a week lasting for several hours," R. 263; *see also* R. 272. She worries about her health and feels like she has "no purpose anymore." R. 264. Her impairments, financial issues, and "lack of health insurance" cause these attacks, and her fatigue and inability "to keep up with" housework worsen them. R. 272. During anxiety attacks, her hands, arms, and legs "get agitated"; she cannot "keep still"; her "whole body then gets agitated"; she must "get up and try to walk"; and she sometimes cries and prays. *Id.*

Kathleen's impairments affect her abilities to lift, squat, bend, stand, reach, walk, kneel, talk, climb stairs, remember, understand, concentrate, use her hands, R. 268, 322, and "sit for long periods of time," R. 262. "Standing, washing dishes, folding laundry, sweeping, mopping, reaching, bending to clean or pick up something, preparing meals, [and] taking out garbage" cause her pain. R. 260; *see also* R. 263. She has "to stop after 10–15 minutes to sit [and] rest before continuing." R. 263; *see* also R. 261. She can walk at most fifty feet before needing to stop and rest for at least ten minutes. R. 320; *see also* R. 262, 268. She has difficulty breathing when carrying "anything much over" ten pounds, R. 316, walking, R. 262, 316, talking, taking out the trash, or emptying the litter box, R. 262. She has "to stop and catch her breath[,] which

takes 20–30 minutes." *Id.* She can pay attention for fifteen minutes at most and does not always

finish what she starts. R. 268, 320. She can follow written instructions "fairly well," R. 322, or

after reading them "a couple of times," R. 268. She needs to have spoken instructions repeated,

R. 268, 322, because she has issues with comprehension and "sometimes with short[-]term

memory loss," R. 268. She gets along well with authority figures. *See* R. 269, 323. She does not

handle stress very well, *id.*, and handles changes in routine "okay," R. 323. She has difficulty

lying down and sleeping because of her back pain and anxiety. R. 262, 264, 317.

Kathleen takes ibuprofen and Flexeril for pain relief, and these medications are "[n]ot

very effective but help[] minimally" and cause no side effects of which she is aware. R. 261. She

had physical therapy "right after surgery," but she has tried no other forms of therapy or

treatment for pain relief. *Id.* "Muscle relaxer[s], sometimes ibuprofen, sitting, resting, [and] lying

down" relieve the pain. *Id.* Taking Xanax, breathing steadily, and trying "to think positive

thoughts" relieve her anxiety. R. 272. She has used a walker "as needed" since her surgery, and

she uses a knee brace. R. 269, 323. Doctors prescribed these aids. *Id.*

On a typical day, Kathleen makes meals, rests, and tries to do chores. R. 264, 316. She

can do only "limited activity due to breathing issues [and] back pain." R. 266. She does not take

care of other people. R. 264, 317. She takes care of her cats by feeding them, cleaning the litter

box, *id.*, and taking them to the veterinarian "if needed," R. 264. Her husband and mother help

her take care of the cats. R. 317. She can dress herself, but she is "careful with bending" because

she "get[s] short of breath." R. 264. She sits to bathe, R. 262, 264, 317, and to dry and style her

hair, R. 264, 317. She shaves infrequently because she is unsteady, R. 317, and "bending [and]

reaching bother[] [her] back and breathing," R. 264. She can use the toilet by herself, but she

must use the "side[ ]wall or counter to help get up [and] down." *Id.* She "ha[s] to make notes to

remind [her]self of things to do [and] when to pay bills," R. 319. She also needs reminders about

her medication schedule. R. 265, 319. Every day, she prepares meals consisting of "mostly

simple things," including sandwiches, frozen food, and pasta. R. 319; *see also* R. 265. Preparing

food used to take her thirty minutes to an hour, R. 265, but now takes her "20–30 minutes," R.

319. When cooking, she sometimes forgets items on the stove. R. 264. Since her impairments'

onset, she cooks smaller meals than she used to, R. 319, and prepares "foods that don't take as

long to mak[e]," R. 265. She dusts, R. 264, cleans the bathroom, R. 319, sweeps, mops, and does

"limited laundry," "for about 10 minutes" at a time before needing to rest. R. 264; *see also* R.

262, 319. Thus, she does not "clean very often," R. 319, and must take breaks when doing

housework, R. 265, 319. It "usually takes the whole next 2 days to recover from activities, even

just grocery shopping." R. 265. She needs "help or encouragement" to do housework, and

sometimes others do housework for her. *Id.* She does yardwork by operating a riding lawn

mower twice a month for two to three hours. R. 319.

  Kathleen goes outside a few times a week because of her "[b]reathing issues," R. 266; *see

also* R. 320, and "chronic back pain," R. 266. She travels by driving and riding in a car, R. 266,

320, but she "limit[s] [her] travel" because she struggles to "get up [and] down [and] walk for [a]

period of time," R. 266. When driving, she cannot "do long trips." R. 262. She does not "drive at

night," and her "reaction time has changed." R. 268. She shops in stores and online for yarn, R.

320, groceries, clothes, R. 266, 320, and medication, R. 320, "1–2 days a week," R. 320, for one

to two hours, *id.*; *see also* R. 266. She can pay bills, count change, handle a savings account, and

use a checkbook or money orders. R. 266, 320.

  For leisure, Kathleen likes to watch television, crochet, R. 267, 321; *see also* R. 262, and

"use social media when able," R. 267. However, crocheting "takes [her] longer," R. 267, 321,

because she struggles "to concentrate and stay focused," R. 267, and to understand crochet patterns or charts, R. 321. She talks to her mother on the phone daily, R. 267, 321, talks to and texts her husband daily, R. 321, and occasionally texts and talks with her sons, R. 267. She regularly goes to Walmart, R. 267, the grocery store, and the "[t]rash deposit," R. 321. She does not need to be reminded to go places, R. 267, 321, but she prefers for her husband "to take [her] places" when he is home. *Id.*

On October 7, 2021, Kathleen testified at the administrative hearing. R. 50–74. She testified that she has back pain. *See, e.g.*, R. 52, 60. She also has shortness of breath, R. 52, and a residual brain tumor, *see, e.g.*, R. 52, 54, 61, 65, 67. She has "had breathing issues ever since" her left vocal cord became paralyzed after the surgery to remove her brain tumor. R. 52. Her otolaryngologist tried to treat her paralyzed vocal cord with injections, which "did not work" and "actually made it worse." R. 58. "[N]othing" her otolaryngologist did "ever helped it." R. 59. Because of her shortness of breath, she "can't walk far and for long," so she is unable to "take a walk down the street." R. 58. She gets winded while grocery shopping, so she "do[es] it slowly" and "lean[s] on the cart." *Id.*; *see also* R. 69. She also gets winded when walking to the mailbox, which "is about 50 feet from [her] house," and she "ha[s] to kind of stop" at the mailbox "for about five minutes" before going back to her house. R. 58. "[I]t takes [her] as long to recover as it does to actually do something," and recovering takes "about 10 to 15 minutes" of "sitting down to rest." R. 69.

Kathleen has daily headaches that sometimes "wrap all the way around [her] whole head" and sometimes are localized "at the back of [her] neck on the right and" left sides. R. 67. Her surgical scar "gets really tight" and "really hurts." *Id.* The headaches "debilitate" her such that she "can't really do anything." R. 68. To help alleviate her headaches, she uses a heating pad;

sometimes takes muscle relaxers or Excedrin, which sometimes helps; and lies in bed in the dark "for a couple hours." *Id.* She also has numbness and tingling in her hands, R. 66–67; *see also* R. 60, and feet, R. 65. She has difficulties with "grasping things, opening things," holding a pen, and holding onto a smaller knife because of the numbness and tingling in her hands. R. 66–67. She struggles to tolerate the cold because of the numbness and tingling in her feet. R. 65.

Kathleen has "problems with [her] arm" and impaired vision. R. 55. As such, she does not "drive long distances" or "drive at night." *Id.* She tries "not to drive a whole lot at all just because [she] had so many issues." R. 66. When she needs to travel longer distances, someone else drives her, R. 55, 61–63; *see also* R. 70, or she uses public transportation, *see* R. 62. She also has restless leg syndrome, which "tends to kick in" after she drives or when she "ha[s] to sit for more than 10 to 15 minutes," causing her to fidget and become "jittery with her legs." R. 66; *see also* R. 64. Then, her "anxiety starts kicking in." R. 66. She takes Effexor, Zoloft, and Xanax for anxiety and depression. R 60. Dr. Adaniel prescribes these medications, but Kathleen does not recall him recommending that she see a psychiatrist or a therapist. R. 61.

Kathleen struggles to finish what she starts. R. 68–69. "[A]bout 20 out of 30 days," she "just do[es] not get up to do a task," and if she does, "it takes [her] a very long time" because she "can't stay focused." R. 69. When she "tr[ies] to read," she has "to go back and re-read." *Id.* She also has "problems getting words sometimes." R. 54; *see also* R. 69.

On "good days," Kathleen does laundry and sweeps. R. 51. She can sweep "for like 10 minutes at a time" before needing to rest for ten to fifteen minutes because of her back pain and shortness of breath. R. 51–52. When she sweeps, she "cannot get everything completed in one day," so she "only do[es] a few rooms a day." R. 52. She uses a "very light[ ]weight" Swiffer WetJet "about once a week." R. 56. She "dust[s] the furniture" using an implement with "a long

extendable handle" that helps her clean "higher spots and lower spots" without reaching or

bending. *Id.* She goes grocery shopping once every week or two, and her husband sometimes

accompanies her. *Id.* Grocery shopping takes "maybe 30 minutes to an hour." R. 57. She gives

her cats food and water and cleans their litter box. R. 60. She uses a larger scoop for the litter

box because "with the numbness in [her] hand[,] it's hard for [her] to grasp" the regular scoop's

handle. *Id.* She must sit to clean the litter box because she has back pain and back spasms and

"get[s] short of breath when [she] ha[s] to bend over." *Id.* Cleaning the litter box takes about four

minutes. *Id.* She no longer mows her lawn using a riding lawn mower because it is "too hard for

[her] to get up and down off of it" and she has "a hard time taking the heat and the humidity

because of" her shortness of breath. R. 64–65. Her mother and neighbors help her with

housework and cooking. R. 70. Her neighbors help her "take things into the house out of [her]

vehicle." *See id.* "They lift things for [her]" and "even will help [her] do [her] cleaning if" she

asks. *Id.* She takes "one to two naps a day," and she is "so tired" and has "such low energy"

because she has sleep apnea and does not "get restful sleep." R. 68. She uses a CPAP machine,

which "helps some[,] but it doesn't help a lot." *Id.*

    *4.    The VE's Testimony*

       The VE testified that Kathleen's past relevant work was "medium as performed." R. 82.

He also testified that someone with Kathleen's vocational profile and RFC, R. 29, 75, could

perform her past relevant work as an assistant manager and other medium jobs like sandwich

maker, general laundry laborer, and general stores laborer, R. 75–78. However, "there would be

no [competitive] work for" someone with Kathleen's vocational profile if the person needed "to

change positions at will every ten minutes"; needed to take ten-minute-long unscheduled breaks

at least hourly; and could walk for ten minutes at a time, sit for twenty minutes at a time, and

"rarely lift less than 10 pounds." R. 80. There would also be no work for someone with

Kathleen's vocational profile who could handle, do fine manipulation, and reach five percent of

the time and would be off task five percent of the time. R. 80–81. Similarly, "there would be no

work" for a person with Kathleen's vocational profile if that person would miss work "more than

four days per month." R. 81.

## C.    *The ALJ's Decision*

ALJ Crovella determined that Kathleen's "left foramen magnum meningioma status-post

left lateral craniotomy and partial resection with residual tumor" was a severe MDI during the

relevant time. R. 27. She found that Kathleen's other alleged impairments were non-severe,

including her "diagnoses of adjustment disorder, depression, and anxiety." R. 27–29. She rated

Kathleen's degree of limitation in each of the four broad functional areas (the "paragraph B"

criteria), R. 28–29, in reaching this conclusion, R. 29 ("Because the claimant's medically

determinable mental impairments cause no more than 'mild' limitations in any of the functional

areas, they are non-severe." (citing 20 C.F.R. § 404.1520a(d)(1)).

First, ALJ Crovella concluded that Kathleen had a mild limitation in understanding,

remembering, or applying information. R. 28. She noted that Kathleen "alleged that she has

difficulty remembering generally, understanding what is said to her, following instructions, and

completing tasks." *Id.* However, Kathleen "also stated that she could perform simple

maintenance, prepare meals, pay bills, go to doctor's appointments, take medications, shop, and

drive." *Id.* "In addition, the record show[ed] that [Kathleen] was able to provide information

about her health, describe her" work history, follow providers' instructions, "comply with

treatment outside of a doctor's office or hospital," and respond to medical providers' questions.

*Id.* "There [wasn't] any mention of any issues with [her] short- or long-term memory." *Id.* The

28

ALJ did not cite any specific evidence to support her findings, and she did not explain how those findings supported a conclusion that Kathleen's mental MDI caused a mild limitation in understanding, remembering, or applying information. *See* R. 28, 32.

Second, ALJ Crovella concluded that Kathleen had mild limitation in interacting with others. *Id.* She noted that Kathleen "did not allege any problems related to this domain." *Id.* She found that Kathleen's "statements" demonstrated an ability "to get along with others, shop, spend time with friends and family, deal appropriately with authority, and live with others," *id.* but she did not cite any specific examples from the record. Finally, she found that "the medical evidence show[ed] that [Kathleen] had good rapport with providers" and "good interactions with non-medical staff," "was described as pleasant and cooperative," and "appeared comfortable during appointments." R. 28–29. The ALJ did not cite any evidence to support her findings. *See* R. 28–29, 32. She also did not explain why Kathleen had a "mild" limitation interacting with others even though she "did not allege any problems related to this domain." *See* R. 28–29.

Third, ALJ Crovella concluded that Kathleen had a mild limitation in concentrating, persisting, or maintaining pace. R. 29. She acknowledged that Kathleen alleged "limitations in concentrating generally, focusing generally, following instructions, and completing tasks," *id.*, but she did not cite any specific examples from the record. "On the other hand," Kathleen "said that she is also able to drive, prepare meals, watch TV, manage funds, use the internet, and handle her own medical care. Additionally, the record fail[ed] to show any mention of distractibility." *Id.* The ALJ did not cite any specific evidence to support her findings about Kathleen's daily activities. *See* R. 29, 32–33. Nor did she explain how she concluded that Kathleen had mild limitation in this functional area. *See* R. 29, 32.

29

Fourth, ALJ Crovella concluded that Kathleen had mild limitation in adapting or managing herself. R. 32. She noted that Kathleen alleged "difficulties managing her mood." *Id.* "That said, [Kathleen] also stated that she is able to handle self-care and personal hygiene, care for pets, and get along with caregivers." *Id.* The ALJ noted that "the objective evidence in the record showed" Kathleen had "appropriate grooming and hygiene, no problem getting along well with providers and staff, and no problems with temper control." *Id.* As before, she did not cite any specific evidence from the record to support her findings and conclusion in this domain. *See* R. 29, 32.

Then, ALJ Crovella analyzed Kathleen's physical RFC. R. 29–33. She summarized certain aspects of the record, including some of Kathleen's written statements and hearing testimony and some of the objective and other medical evidence in the record. R. 30–33. Although the ALJ mentioned in passing that Kathleen alleged depression, anxiety and panic attacks, R. 32, she did not discuss any examination findings or medical treatment related to Kathleen's mental health, *see* R. 30–33. Her RFC finding does not restrict or limit Kathleen's capacities to perform mental work-related activities on a regular and continuing basis. R. 29.

ALJ Crovella then evaluated some of the medical-opinion evidence in the record. *See* R. 31–32. The ALJ found that Dr. Hill's and Dr. McGuffin's opinions about Kathleen's physical functioning were "persuasive overall" because they were "consistent with the evidence" and "DDS provided good support for its findings." R. 32. She did not mention Dr. Peterson's or Dr. Perrot's medical opinions about Kathleen's anxiety disorder and depressive disorders. *See id.*

The ALJ "d[id] not find [Dr. Greene's] opinion to be persuasive." R. 31. She found that this opinion was "inconsistent with the available evidence, which show[ed] far milder limitations." *Id.* She noted that Dr. Greene and other providers "did not record the degree of

limitations suggested [t]here, nor ha[d] [Kathleen] alleged any," and "physical examinations were uniformly normal or close to it[] and d[id] not show anything that would cause such severe issues with functioning." *Id.* She further determined that Dr. Greene's opinion was "poorly supported" because "it provide[d] few explanations for its findings, and even then only mention[ed] symptoms but not how they actually affect[ed] a given area." *Id.* She noted that Dr. Greene opined that "difficulty breathing and hand numbness affect[ed] [Kathleen]'s stress tolerance, but d[id] not say how." *Id.* Finally, she concluded that the opinion was "self-contradictory" because Dr. Greene opined that Kathleen "would need 15-minute breaks every 10 minutes, which [wa]s not actually possible." *Id.*

As for Dr. Adaniel's medical source statement from September 2021, the ALJ "d[id] not find this opinion to be persuasive either, largely for the same reasons as the previous one." *Id.* She concluded that the "record fail[ed] to show any objective findings or allegations" that were "consistent with this degree of limitation[]" and that the opinion was "wholly unsupported, with no explanations for why a given limitation was found." *Id.* The ALJ did not mention Dr. Adaniel's earlier medical opinion from July 2021.

D.    Discussion

Kathleen challenges ALJ Crovella's RFC determination on two grounds. *See* Pl.'s Br. 11–22. First, she argues that because the ALJ did not consider her non-severe mental MDI after step two, the ALJ's RFC finding is not supported by substantial evidence. *Id.* at 11–14. The ALJ also failed to explain why the mental MDI caused only "mild" limitations in her overall abilities to understand, remember, or apply information, interact with others, and concentrate, persist, and maintain pace in the workplace. *See id.* Second, Kathleen argues that the ALJ improperly evaluated Dr. Greene's and Dr. Adaniel's medical opinions. *Id.* at 14–22. Specifically, she

argues that the ALJ did not adequately explain how these opinions were inconsistent and unsupported. *Id.* at 18–22.

    *1.    Mental MDIs*

    At step two, an ALJ must determine whether a claimant has an MDI that is severe or a combination of MDIs that are severe. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995); 20 C.F.R. § 404.1520(c). The claimant bears the burdens of proof and production on this issue. *Bowers v. Colvin*, 628 F. App'x 169, 171 (4th Cir. 2015) (per curiam). "The severity determination is ultimately 'a threshold question with a de minimis . . . requirement.'" *Moore v. Colvin*, No. 2:14cv9913, 2015 WL 1481732, at *4 (S.D. W. Va. Mar. 31, 2015) (citing *Felton-Miller*, 459 F. App'x at 230).

    The ALJ must use a special technique when evaluating mental MDIs. *Patterson*, 846 F.3d at 659; *Janet L. v. Saul*, No. 19-2544, 2021 WL 1733469, at *4 (D. Md. Apr. 30, 2021) (citing 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2)). The ALJ must determine whether the claimant has a medically determinable mental impairment, 20 C.F.R. § 404.1520a(b)(1), which requires her to make a finding about "the type" of the claimant's mental impairment, *see Patterson*, 846 F.3d at 659. If the ALJ finds that the claimant has a mental MDI, then she must "rate the degree of functional limitation resulting from the impairment[]" in each of "four broad functional areas." *Id.* § 404.1520a(b)(2), (c)(3); *see also Karen Ann G. v. Saul*, No. 19-972, 2020 WL 5369112, at *4 (D. Md. Sept. 8, 2020). These functional areas are: (1) "[u]nderstand, remember, or apply information"; (2) "interact with others"; (3) "concentrate, persist, or maintain pace"; and (4) "adapt or manage oneself." 20 C.F.R. § 404.1520a(c)(3). The ALJ must rate the claimant's degree of limitation in each area "us[ing] the following five-point scale: None, mild, moderate, marked, and extreme." *Id.* § 404.1520a(c)(4).

If the ALJ determines that the claimant's degree of limitation in all four areas is "none" or "mild," then the mental impairment is generally considered non-severe "unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." *Karen Ann G.*, 2020 WL 5369112, at *4 (alteration in original) (quoting 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1)). "Basic work activities" are the "abilities and aptitudes necessary to do most jobs," including things like following "simple instructions," "responding appropriately to supervision [and] co-workers," and "dealing with changes in a routine work setting." *See* 20 C.F.R. § 404.1522(b). The ALJ's "decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)." 20 C.F.R. § 404.1520a(e)(4).

The step-two severity analysis informs the ALJ's RFC analysis between steps three and steps four of the disability determination. *See Patterson*, 846 F.3d at 659–62. The RFC is a more "holistic and fact-specific evaluation," and "the ALJ cannot conduct it properly without reaching detailed conclusions at step 2 concerning the type and severity of the claimant's impairments." *Id.* at 659. The ALJ's "failure to properly document application of the special technique will rarely, if ever, be harmless because such a failure prevents, or at least substantially hinders, judicial review." *Id.* at 662.

Here, ALJ Crovella rated Kathleen's degree of limitation in each of the four broad functional areas, R. 28–29, but her decision "contained no specific citation to the evidence [she] considered nor any explanation of the ALJ's reasoning in making those findings," *Barnhart v. Colvin*, Civ. No. 16-0629, 2017 WL 748974, at *6 (D. Md. Feb. 24, 2017) (reversing and remanding based on an ALJ making this error at step three); *see also Hopkins v. Berryhill*, Civ.

No. 1:17-143, 2017 WL 6398181, at *17–18 (D.S.C. Nov. 21, 2017), *adopted*, 2017 WL

6366879 (D.S.C. Dec. 12, 2017) (reversing and remanding because the ALJ rated the degree of

limitation in each functional area and cited evidence to support her non-severity determination,

but she "did not reference specific evidence" or explain how the evidence supported her

conclusion). At step two, the ALJ should explain "how [s]he weighed all relevant evidence" and

"how [s]he reached h[er] conclusions about" the mental MDIs' severity. *See Patterson*, 846 F.3d

at 659–62; *cf. Barnhart*, 2017 WL 748974, at *6 (at step three, using the same special technique,

"[i]t remains incumbent on the ALJ to clearly articulate the reasons for h[er] findings in each of

the functional areas"). Instead, ALJ Crovella listed statements and findings without specifically

citing the evidence or explaining how she concluded, based on the evidence, that Kathleen had

"mild" limitations in each broad functional area. *See* R. 28–29. At times, the ALJ's analysis and

conclusions were internally inconsistent. She determined that Kathleen had mild limitations in

interacting with others even though she listed only statements and findings suggesting Kathleen

had no limitation in this area and acknowledged that Kathleen "did not allege any problems" in

this area. *See id.* The ALJ omitted Kathleen's PHQ-9 scores, R. 562, 1054, 1099, 1137, and her

testimony that she had "problems getting words sometimes," R. 54; *see also* R. 69.

　　ALJ Crovella did not rectify this error elsewhere in her decision. *See* R. 33–34. In her

RFC analysis, she mentioned in passing that Kathleen alleged depression, anxiety, and panic

attacks. R. 32. However, she did not discuss any examination findings, *e.g.*, R. 404, 415, 429,

554, 556–57, 562, 676, 682, 912, 917, 1029, 1034, 1105, assessed functional limitations, R. 559,

pharmacological treatment, *e.g.*, R. 1025, 1030, 1040, 1050, 1096, 1113, 1137, or specific

symptoms related to Kathleen's mental health issues, *e.g.*, R. 263–64, 268, 271–72, 322–23, 443,

1027, 1051, 1093, 1134. *See* R. 30–33. She did not acknowledge that Dr. Greene and Dr. Adaniel

34

had both opined that anxiety and depression "affected" Kathleen's physical condition, R. 354, 933, 1142–42, and sometimes her symptoms will be "severe enough to interfere with attention and concentration needed to perform even simple work tasks," R. 357, 935, 1143 (emphasis omitted). *See generally* R. 30–33. The ALJ's failure to acknowledge *any* of this relevant evidence in her decision is especially troubling given her RFC-stage finding that "the record support[ed] the *types* of limitations" Katheen alleged, even if it did "not support their severity." R. 32; *cf. Lawson v. Astrue*, No. 7:06cv747, 2007 WL 4268913, at *5 (W.D. Va. Nov. 30, 2007) (substantial evidence did not support ALJ's finding that claimant's mental MDI was non-severe where claimant had a "documented history" of anxiety and had been treated with medication "over a period of years").

The ALJ's failure to explain how she arrived at her conclusion that Kathleen's mental MDIs were non-severe combined with her failure to discuss the medical and other evidence of Kathleen's mental MDIs in her RFC analysis leaves this Court unable to conduct meaningful review. *See Patterson*, 846 F.3d at 662; *cf. Barnhart*, 2017 WL 748974, at *6. And, because I "cannot review the ALJ's mental-impairment evaluation, [I] cannot say that [s]he properly assessed [Kathleen]'s RFC." *Patterson*, 846 F.3d at 662; *see also Michelle A. v. Kijakazi*, Civ. No. 21-1200, 2022 WL 2918143, at *3–4 (D. Md. July 25, 2022). Thus, remand is required.

### 2.    *Dr. Greene's & Dr. Adaniel's Medical Opinions*

"Medical opinions"—that is, "statement[s] from a medical source about what [the claimant] can still do despite" her MDIs and whether the claimant has "impairment-related limitations or restrictions" in meeting specific physical, mental, or environmental demands of work, 20 C.F.R. § 404.1513(a)(2)—can be critical to a proper RFC analysis. *See, e.g.*, *Oakes v. Kijakazi*, 70 F.4th 207, 212–15 (4th Cir. 2023); *Woods*, 888 F.3d at 695. The regulations specify

"how [ALJs] consider medical opinions" as part of their disability determinations and "how

[ALJs] articulate" certain findings in their written decisions. 20 C.F.R. § 404.1520c (claims filed

on or after March 27, 2017). First, ALJs "will not defer or give any specific evidentiary weight,

including controlling weight, to any medical opinion(s)" in the claimant's record. *Id.* §

404.1520c(a). Instead, ALJs "will consider [all] medical opinions . . . using the factors listed in

[subparagraphs] (c)(1) through (c)(5) . . . , as appropriate." *Id.*; *see Oakes*, 70 F.4th at 212.

Second, ALJs "will articulate . . . how persuasive [they] find all of the medical opinions" in the

claimant's record. 20 C.F.R. § 404.1520c(b). These "articulation requirements" in turn instruct

ALJs to "articulate how [they] considered the medical opinions from [each] medical source" on a

source-by-source basis. *Id.* § 404.1520c(b)(1). They "are not required to articulate how [they]

considered each medical opinion . . . from one medical source individually." *Id.* ALJs should

"articulate how [they] considered the medical opinions . . . from [each] medical source together

in a single analysis using the factors listed in [subparagraphs] (c)(1) through (c)(5) . . . , as

appropriate." *Id.* These "persuasiveness" factors include: "(1) supportability; (2) consistency; (3)

a physician's relationship with the claimant; (4) a physician's specialization; and (5) other

factors, like the physician's familiarity with the evidentiary record" and the standard for

determining disability. *See Oakes*, 70 F.4th at 212 (citing 20 C.F.R. § 404.1520c(c)(1)–(5)).

The first two factors—supportability and consistency—"are the most important factors

[ALJs] consider when [they] determine how persuasive [they] find a source's medical opinions .

. . to be. Therefore, [ALJs] will explain how [they] considered the supportability and consistency

factors for [each] medical source's medical opinions." 20 C.F.R. § 404.1520c(b)(2).

Supportability and consistency are distinct legal concepts under the regulations. *Id.* §

404.1520c(b)(2)–(c)(2); *Oakes*, 70 F.4th at 212. "Supportability" requires ALJs to consider "the

objective medical evidence and . . . explanations *presented by* [the] medical source . . . to support

his or her [own] medical opinion(s)." 20 C.F.R. § 404.1520c(c)(1) (emphasis added); *see Oakes*,

70 F.4th at 212. "Consistency" requires ALJs to compare that source's medical opinions to

"evidence *from other* medical and nonmedical sources" in the claimant's record. 20 C.F.R. §

404.1520c(c)(2) (emphasis added); *see Oakes*, 70 F.4th at 212. Thus, ALJs must explain how

they considered *both* supportability *and* consistency for each source's medical opinion. 20 C.F.R.

§ 404.1520c(b)(2). They "may, but are not required to, explain how [they] considered the [other]

factors" in determining how persuasive the source's medical opinions are to the disability

determination. *Id.*

    As always, the ALJ's decision must build an accurate and "logical bridge between the

evidence and the ALJ's conclusion that [a medical] opinion," *Oakes*, 70 F.4th at 214, is or is not

"persuasive" evidence of the claimant's allegedly disabling medical condition, *see id.* at 212–13.

When the court is "'left to guess' as to how the ALJ reached her evaluation of the conflicting

medical opinions in light of the evidence of record," then it cannot "review the reasonableness of

her conclusions," *Testamark v. Berryhill*, 736 F. App'x 395, 398 (4th Cir. 2018) (per curiam)

(quoting *Mascio*, 780 F.3d at 638), to ensure that "the ALJ's decision is supported as a matter of

fact and law," *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018) (per curiam).

    ALJ Crovella "d[id] not find" either Dr. Greene's or Dr. Adaniel's medical opinion

"persuasive." R. 31. On supportability, she explained that Dr. Greene's medical opinion was

"poorly supported, in that it provide[d] few explanations for its findings, and even then only

mention[ed] symptoms but not how they actually affect[ed] a given area." R. 31. As an example,

she noted that Dr. Greene opined that "difficulty breathing and hand numbness affect[ed]

[Kathleen]'s stress tolerance," but he did not "say how." *Id.* As for Dr. Adaniel's medical

opinion, the ALJ found that it was "wholly unsupported, with no explanations for why a given limitation was found." *Id.* The supportability factor examines the "objective medical evidence and supporting explanations presented by a medical source . . . to support his or her [own] medical opinion[]." 20 C.F.R. § 404.1520c(c)(1). The "more relevant" the evidence and explanations a medical source presents "to support his or her medical opinion[]" are, "the more persuasive" that opinion will be. *See id.* ALJ Crovella accurately described and evaluated supportability for these opinions, both of which offer scant supporting explanations at best and did not cite record evidence. *See* R. 932–35; 1142–45. Having done so, she reasonably concluded that the lack of internal support rendered these opinions less persuasive. *See Jennifer C.D. v. Kijakazi*, No. 3:21cv280, 2022 WL 4272301, at *4 (E.D. Va. Sept. 15, 2022).

Nonetheless, ALJ Crovella's analysis of Dr. Greene and Dr. Adaniel's opinions does not satisfy "this deferential standard" of review. *Arakas v. Comm'r of Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020). On the consistency factor, "[t]he more consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] . . . will be." 20 C.F.R. § 404.1520c(c)(2). The ALJ found that Dr. Greene's opinion was "inconsistent with the available evidence, which show[ed] far milder limitations." R. 31. She noted that Dr. Greene and other providers "did not record the degree of limitations" Dr. Greene opined and that "physical examinations were uniformly normal or close to it" and did "not show anything that would cause such severe issues with functioning." *Id.* However, the ALJ did not mention any specific evidence from the record, let alone explain how Dr. Greene's opinion was "inconsistent with" any relevant record evidence. *See id.* Moreover, by describing Kathleen's physical examination findings as "uniformly normal or close to it," the ALJ mischaracterized the evidence. For example, on various examinations, Kathleen had a

paralyzed left vocal cord, *see, e.g.*, R. 408, 415, 430, 905, 912, 914, 917, 1078, causing shortness

of breath, R. 1078; a residual brain tumor that grew "slightly" after her first surgery, R. 453, 603,

yielded "MRI evidence of persistent medulla compression," R. 855, caused clinical signs of

myelopathy, R. 855, and required additional treatment, R. 454, 850–55, 1120–22; slightly

decreased grip strength, R. 854; and "+3" patellar reflexes, *id.* As for Dr. Adaniel's opinion, the

ALJ found it unpersuasive "largely for the same reasons as the previous one," and she concluded

that the "record fail[ed] to show any objective findings or allegations from [Kathleen] that [we]re

consistent with this degree of limitations." R. 31. This single sentence again did not mention any

specific record evidence or explain how any relevant record evidence was not consistent with Dr.

Adaniel's opinion. *See id.* These faulty explanations leave the Court to guess how the ALJ

concluded that Dr. Greene and Dr. Adaniel's opinions were not persuasive. *See Testamark*, 736

F. App'x at 398.

       These errors are especially problematic because the limitations Dr. Greene and Dr.

Adaniel assessed conflict with aspects of ALJ Crovella's RFC determination. *Compare* R. 932–

35, *and* R. 1142–45, *with* R. 29. Even if partially credited, Dr. Greene's and Dr. Adaniel's

assessment of Kathleen's exertional capacities alone would result in a determination that she was

disabled during the relevant time. *Compare* R. 33–34 (citing 20 C.F.R. pt. 404, subpt. P, app. 2

§§ 203.07, 203.15), *with* 20 C.F.R. pt. 404, subpt. P, app. 2 §§ 201.06, 202.06. Dr. Greene and

Dr. Adaniel's opinions that Kathleen could never crouch or climb ladders, R. 934, 1144, conflict

with the ALJ's finding that she could occasionally climb ladders and frequently crouch, R. 29.

Relying on the VE's testimony, the ALJ found that Kathleen was not disabled because her RFC

and vocational profile allowed her to return to her previous work and perform other sample jobs

that existed in the national economy. *See* R. 33–35 (citing R. 75–78). However, the VE also

testified that if someone with Kathleen's vocational profile and RFC were further limited to handling, doing fine manipulation tasks, reaching for five percent of a workday and being off task five percent of the time, "that would impact the ability to perform the past work or any work in the national economy." R. 80–81. Dr. Greene identified all these limitations, R. 934–35, and Dr. Adaniel opined that Kathleen would be off task for five percent of an eight-hour workday, even if that work involved only "simple" tasks, R. 1145. Similarly, the VE testified "there would be no work appropriate" for someone who needed to miss work "more than four days per month," R. 81, a limitation Dr. Greene identified, R. 935. Therefore, remand is required.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Kathleen's motion for summary judgment, ECF No. 20, **DENY** the Commissioner's motion for summary judgment, ECF No. 24, **REVERSE** the Commissioner's final decision denying Kathleen's DIB claim, and **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g).

### **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall serve certified copies of this Report and Recommendation on all counsel of record.

ENTER: March 11, 2024

Joel C. Hoppe
United States Magistrate Judge